# UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| **VIRGINIA E-COMMERCE SOLUTIONS, LLC,** | |
| Plaintiff, | |
| v. | **Case No. 1:10-CV-01229-LMB** |
| **EBAY INC. and PAYPAL, INC.,** | |
| Defendants. | |

## CONFIDENTIAL MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................ 1

II.  STATEMENT OF UNDISPUTED FACTS .......................................................... 2

    A.  The Asserted '753 Patent ..................................................................... 2

    B.  The Accused Products............................................................................ 4

    C.  The Verza Prior Art System................................................................. 11

III.  ARGUMENT................................................................................................ 12

    A.  CLAIM CONSTRUCTION-BASED NON-INFRINGEMENT:  Under Proper
    Claim Constructions, Defendants Do Not Infringe the Asserted Claims of the '753
    Patent as a Matter of Law ................................................................... 13

        1.  "WEB, DB SERVER":  eBay Has the Requisite Security to Protect Credit
        Card Information Transmitted from a Buyer, and Therefore Cannot Have the
        Web, DB Server Required By the Claims ....................................... 14

            (a) The Proper Construction of "Web, DB server" (and Similar Terms)....... 15

            (b) eBay Servers Are Not Web, DB Servers, And Therefore Cannot Infringe
            ............................................................................................... 19

        2.  "PURCHASE REQUEST":  A Buyer's Commitment To Buy On eBay Does
        Not Cause The Switch Required By The Claims............................................. 20

            (a) "purchase request" / "an indication from the buyer to buy".................... 21

            (b) A Commitment to Buy On eBay Does Not Cause a Switch To PayPal. .. 22

        3.  "CREDIT CARD PAYMENT INFORMATION":  Credit Card Payment
        Information Is Entered into PayPal by a Buyer Only When a Credit Card
        Funding Source Is First Configured................................................... 24

            (a) "credit card payment information" ........................................... 24

            (b) PayPal Accountholders Do Not Enter Credit Card Payment Information
            For Every Purchase ................................................................... 26

B.     NON-INFRINGEMENT BASED ON DIVIDED INFRINGEMENT:  Defendants Cannot Infringe All of the Limitations of the Claims of the '753 Patent Because these Claims Require Actions by Multiple Parties ............................................... 28

     1.   VECS Accusations Require eBay and PayPal and other third parties............ 28

     2.   The Law of Joint (Divided) Infringement........................................................ 29

     3.   PayPal Does Not Control Aliexpress, Overstock.com, Buy.com, eBid, iOffer, and Webstore ................................................................................................. 31

     4.   PayPal Does Not Control eBay..................................................................... 32

C.     NO INDIRECT INFRINGEMENT:  VECS' Inducement Claim Fails as a Matter of Law ................................................................................................................ 33

     1.   A Complaint cannot be the sole basis to establish knowledge of the patent. . 33

     2.   VECS has no evidence of specific intent....................................................... 34

D.     INVENTION DATE:  The Invention Date of the '753 Patent Cannot Be Earlier Than the Date that the Application for the '705 Patent Was Filed........................ 36

E.     INVALIDITY: The '753 Patent is Invalid As a Matter of Law ............................ 38

     1.   Verza is Invalidating Prior Art to the '753 Patent .......................................... 38

F.     NO INJUNCTIVE RELIEF AVAILABLE:  VECS Is Not Entitled to Injunctive Relief.............................................................................................................. 39

IV.        CONCLUSION................................................................................................ 40

# TABLE OF AUTHORITIES

CASES

*ACCO Brands, Inc. v. ABA Locks Mfr. Co., Ltd.,*
   501 F.3d 1307 (Fed. Cir. 2007)....................................................................35

*Anderson v. Liberty Lobby. Inc.,*
   477 U.S. 242 (1986)......................................................................................12

*AstraZeneca LP v. Apotex, Inc.,*
   633 F.3d 1042 (Fed. Cir. 2010)....................................................................16

*Baden Sports, Inc. v. Kabushiki Kaisha Molten,*
   2007 WL 2790777 (W.D. Wash. Sept. 25, 2007)........................................39

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.,*
   796 F.2d 443 (Fed. Cir. 1986)......................................................................36

*Black & Decker (US) Inc. v. Catalina Lighting, Inc.,*
   953 F. Supp. 134 (E.D. Va. 1997)................................................................35

*BMC Resources, Inc. v. Paymentech, L.P.,*
   498 F.3d 1373 (Fed. Cir. 2007)...............................................................29, 30

*Bryant v. Bell Atl. Md., Inc.,*
   288 F.3d 124 (4th Cir. 2002)........................................................................12

*Burroughs Wellcome Co. v. Barr Labs., Inc.,*
   40 F.3d 1223 (Fed. Cir. 1999)......................................................................36

*Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.,*
   631 F.3d 1279 (Fed. Cir. 2011)....................................................................30

*Cross Med. Prods. Medtronic Sofamor Danek, Inc.,*
   424 F.3d 1293 (Fed. Cir. 2005)....................................................................30

*CSIRO,*
   492 F. Supp. 2d at 605..................................................................................39

*DSU Med. Corp. v. JSM Co.,*
   471 F.3d 1293 (Fed. Cir. 2006) (en banc)....................................................35

*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006)......................................................................................39

*Edward Lifesciences LLC v. Cook Inc.,*
   582 F.3d 1322 (Fed. Cir. 2009)....................................................................24

*Estee Lauder Inc. v. L'Oreal, S.A.*,
   129 F.3d 588 (Fed. Cir. 1997)................................................................................37

*Fujitsu Ltd. v. Netgear, Inc.*,
   620 F.3d 1321 (Fed. Cir. 2010).............................................................................14

*Golden Hour Data Sys., Inc. v. emsCharts, Inc.*,
   614 F.3d 1367 (Fed. Cir. 2010).............................................................................29

*Hahn v. Wong*,
   892 F.2d 1028 (Fed. Cir. 1989).............................................................................36

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008).............................................................................13

*Insituform Techs., Inc. v. Cat Contracting, Inc.*,
   161 F.3d 688 (Fed. Cir. 1998)...............................................................................33

*Kendall v. Searles*,
   173 F.2d 986 (CCPA 1949) ...................................................................................36

*Knapp-Monarch Co. v. Casco Products Corp.*,
   342 F. 2d 622 (7th Cir. 1965) ...............................................................................33

*Kondo v. Martel*,
   220 U.S.P.Q. 47 (Bd. Pat. Inter. 1983) .................................................................37

*Masimo Corp. v. Mallinckrodt Inc.*,
   18 Fed. Appx. 852 (Fed. Cir. 2001).......................................................................25

*McKesson Techs. Inc. v. Epic Sys. Corp.*,
   -- F.3d --, 2011 WL 1365548 (Fed. Cir. Apr. 12, 2011).................................29, 32

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
   420 F.3d 1369 (Fed. Cir. 2005).............................................................................34

*MercExchange v. eBay, Inc.*,
   500 F. Supp. 2d 556 (E.D. Va. 2007) ....................................................................40

*Metro-Goldwyn-Mayer Studios, Inc.*, 125 S. Ct. at 2780 .............................................35

*Muniauction, Inc. v. Thomson Corp.*,
   532 F.3d 1318 (Fed. Cir. 2008).......................................................................29, 31

*Netcraft Corp. v. eBay Inc.*,
   549 F.3d 1394 (Fed. Cir. 2008).............................................................................16

*NTP, Inc. v. Research in Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005).............................................................................31

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)......................................................16

*Phoenix Sol'ns, Inc. v. DirecTV Group, Inc.*,
   2009 U.S. Dist. LEXIS 114977 (C.D. Cal. Nov. 23, 2009)..................................30

*Smith & Nephew*,
   466 F. Supp. 2d at 983 ..................................................................................39

*Tech. Patents LLC v. Deutsche Telekom AG*,
   2010 WL 3895338 (D. Md. Sept. 29, 2010) ........................................................30

*Technology Patents, LLC v. Deutsche Telekom AG*,
   573 F. Supp. 2d. 903 (D. Md. 2008) ...................................................................31

*TecSec, Inc. v. Int'l Bus. Machines Corp.*,
   -- F. Supp. 2d --, 2011 WL 779886 (E.D.Va. Mar. 3, 2011) .................................29

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007)........................................................................39

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1328 (Fed. Cir. 2009)........................................................................35

*Warner-Lambert Co. v. Teva Pharm. USA, Inc.*,
   418 F.3d 1326 (Fed. Cir. 2005)........................................................................34

*Xpoint Technologies, Inc. v. Microsoft Corp.*,
   730 F. Supp. 2d 349 (D. Del. 2010)..................................................................33

## STATUTES

35 U.S.C. § 104................................................................................................37

35 U.S.C. § 271(a) ...........................................................................................31

35 U.S.C. § 271(b) ...........................................................................................34

## OTHER AUTHORITIES

37 CFR 1.111 at 2 ..............................................................................................4

Fed. R. Civ. P. 56(c) .........................................................................................12

## I.   INTRODUCTION

This is a patent case.  The sole asserted patent, U.S. Patent No. RE40,753 ("the '753 patent"), is directed to a specific implementation of a system designed to allow online purchasers to shop without security on one web site, and then pay securely on another web site.

Any facial similarities between the claimed invention on the one hand, and well-known internet payment systems on the other, is not mere accident.  Originally, the U.S. Patent and Trademark Office issued an even narrower patent on the claimed invention.  The named inventors – UDC business professor Tiehong Ann Wang, and Chinese nationals Tiejun Ronald Wang (Ms. Wang's brother) and Ximing Wang (their father, a retired mechanical engineering professor who has never purchased anything online) – carefully studied the state of the market after their original patent issued.  They calculated how best to contort their claims in an attempt to cover (what they gauged to be) commercially successful payment companies.  Then, they asked the Patent Office to reissue their patent.  The Patent Office reissued the patent in June 2009, as the asserted '753 patent.  The Patent Examiner stated in his "reasons for allowance" that the reissued patent would be allowed, *inter alia*, **because it did not cover PayPal**.

The Patent Office's reissuance of the '753 patent makes sense only when the claims of the patent are construed properly to reflect what the named inventors actually regarded as their particular and peculiar invention.  Those constructions are borne out by the patent's brief specification (the written description of the alleged groundbreaking invention totals less than five columns, rendering each word critical) and other evidence, such as the prosecution history and the inventors' own testimony.  The claimed invention, properly construed, is commercially irrelevant:  indeed, the plaintiff, Virginia E-Commerce Solutions, LLC ("VECS"), has never made or sold anything in accordance with the '753 patent.

Rather than accepting the '753 patent for what it really is, VECS seeks to spin straw into gold, violating cardinal rules of patent law construction and infringement along the way. Properly construed, neither eBay nor PayPal[1] (nor the two together) can infringe the patent, because their systems lack essential elements of the claims. As this Court recognized at the outset of the case, the patent also suffers from serious divided infringement problems, both between eBay and PayPal, and even more so when third parties (who are non-parties to this case) are factored in. The patent, as read by VECS, is invalid. Finally, even if VECS has some chance of prevailing on the merits of the case, it is wholly unable to satisfy the requirements for injunctive relief.

## II.   STATEMENT OF UNDISPUTED FACTS

### A.   The Asserted '753 Patent

1. The '753 patent issued on June 16, 2009 and is entitled *Method and System for Conducting Business in a Transnational E-Commerce Network.* (Ex. 1, '753 patent at cover.) The "transnational" aspect of the patent is found in the notion that a "Web, DB" server is located overseas (in a country with questionable network security), and the payment server is located in a security-trusted country (such as the United States). *Id.* at 2:9-27. The patent is a reissue of prior U.S. Patent No. 6,618,705 ("the '705 patent"), filed Apr. 19, 2000, issued Sept. 9, 2003. (Ex. 2, '705 patent at cover.) Both patents describe "a method and system of processing the purchase of goods and/or services….in an e-commerce business environment." '753 patent, col. 1:6-11; '705 patent, col. 1:11-16.

2. The '753 patent generally describes an arrangement by which a buyer securely pays in real-time with a credit card for items purchased online on an unsecured server. In particular, the

---

[1]   As used herein, "eBay" refers to eBay.com, which is the pertinent functional part of Defendant eBay Inc. for purposes of this case, and "PayPal" refers to Defendant PayPal, Inc.

'753 patent describes two distant, physically separate servers—a Web, DB server and a payment server. A potential online buyer searches a number of available items posted for sale on the Web, DB server by a multitude of sellers. '753 patent, claim 17, col. 7:40-50. Once the user decides to buy an item, the user provides an indication to purchase the item, *id.* at 7:51-7:53, which switches the buyer's connection from the Web, DB server to a distinct, separate, and more secure payment server in a different locale. *Id.* at 7:54-56; 8:1-3; 8:10-17.

3. Following the communication switch to the payment server, the buyer inputs credit card payment information that the system forwards to one or more banks (what the patent terms "established financial channels or circuits") to approve or reject the credit card transaction. *Id.* at 7:57-62. Once, the payment has been processed by the banks, the Web, DB server receives a notification and is updated to reflect the processing decision. *Id.* at 7:63-66, 8:4-8. The operation of the '753 patent is illustrated in Figure 3, which is reproduced in Appendix A.

4. As explained by VECS' technical expert, the invention described in the '753 patent "dissociate[s] product search and selection aspects from payment aspects." (Ex. 3, Menascé Infringement Report ("Menascé Inf.") at ¶ 28; *see also* Ex. 4, Clark Rebuttal Report ("Clark Rebuttal") at ¶ 21 ("[T]he '753 patent's claimed system provides a separate Web, DB server that provides web pages of available products (and performs other function) and a separate payment server.").) Thus, product search and selection takes place at a web site on the patent's "Web, DB server" that allows a plurality of sellers to list their items, but once a purchase request is made by the buyer, his communication is automatically and in real-time switched to the payment server. (Menascé Inf. at ¶ 28.) As the applicants made clear during prosecution, this switching is caused by the Web, DB server. (*See* Ex. 5, '753 Patent Pros. History, July 26, 2007 Supplemental Amdt. at 18-19.)

5. Figure 2 of the patent shows "the inventive system" for conducting an Internet transaction "wherein at least one merchant maintains a website of products available for sale on the Web, DB (Database) server." '753 patent, at 3:59-62. In system of the '753 patent, the Web, DB server does not have a sufficiently secure system to consummate credit card transactions, so a separate payment server—having adequate security—is employed, together with an acquiring bank and the buyer's bank. *Id.* at 3:62-4:7. Once a buyer chooses to purchase a product listed on the Web, DB server using a credit card, "the buyer is shifted to the payment server for direct communication" in order to securely enter credit card information. *Id.* at 4:7-12; Fig. 4A.[2]

6. The payment server, in turn, encrypts credit card payment information and transmits it to the acquiring bank, which communicates with the buyer's bank to either confirm or reject the transaction, based on the credit card information entered by the buyer. *Id.* at 4:13-23; Fig. 4A. If the purchase is confirmed, then the payment server provides purchase information to the buyer. *Id.* at 4:23-24; Fig. 4B. Further, if the purchase is confirmed to the buyer, then the payment server communicates the purchase to the Web, DB server, which enables merchant to refresh its product inventory. *Id.* at 4:24-30; Fig. 4B. "The net result is the real-time purchase of a product using the Internet." *Id.* at 4:30-31.

B.     **The Accused Products**

---

[2] *See also* Ex. 6, '705 Patent Pros. History, 9/5/2002 Supplemental Reply Under 37 CFR 1.111 at 2 ("[T]he instant invention is directed to locating the payment function in a country or nation with an advanced credit card security infrastructure thereby providing credit card online payment security which is otherwise not available to internet buyers. In the instant invention, of all the connections among the Web server, payment server, and the customer, only the one between the customer and the payment server requires an adequate security level for a buyer.").

7. VECS has alleged that eBay "literally" infringes claims 17, 24, 25, 30, 35, 36, 55, 58, and 59, and that PayPal "directly" infringes claims 67 and 83 of the '753 patent.[3] (Second Amended Complaint ("SAC"), Dkt. No. 49 at ¶¶ 23, 39.) VECS also alleges that certain unspecified users following eBay's instructions, directly infringe claims 30, 35, and 36, and that certain unspecified users following PayPal's instructions, directly infringe claim 83. (*Id.* at ¶¶ 25, 42.) In the main, VECS accuses the arrangement in which a customer wants to buy a product listed on eBay.com, and wants to pay for the purchase using PayPal.com. (*Id.* at ¶ 10.) VECS eventually attempted to broaden its allegations to also accuse PayPal's interactions with third party web sites, such as Buy.com, Overstock.com, eBid.com, iOffer.com, WebStore.com, and AliExpress.com. (*See* Ex. 7, Menascé Inf., Exs. D-I.) VECS has provided no evidence that PayPal controls any of these third parties, or that any of these third parties is PayPal's agent.

*The Accused eBay System*

8. eBay is a web site that functions as a marketplace, bringing together sellers and buyers. (Ex. 8, eBay 2010 Annual Report at 3.) There are various selling formats available to sellers; for purposes of this case, the implicated formats are auction-type listings, and fixed price listings which allow 'Buy it Now' purchases. (*Id.*; Ex. 9, Depo. of Cheong at 30:21-32:1; Ex. 4, Clark Rebuttal, Ex. 5, 6.) eBay offers buyers selling formats that are not accused and therefore cannot be infringing, such as the Classified Ad selling format and the Best Offer feature available in the fixed price listings. eBay also offers buyers several types of payment methods, such as "Bill Me Later" and "Integrated Merchant Credit Card/IMCC" which VECS has not accused and therefore cannot be infringing.

---

[3] For ease of reference, the asserted claims are reproduced in Appendix B hereto.

5

9.  In an auction-type listing, a seller lists an item that is up for bidding, and sets a time by which the bidding will end. (Ex. 8, eBay 2010 Annual Report at 3; *see, e.g.,* Menascé Rpt., Exh. C, at 52.)  When a potential buyer submits a bid, that potential buyer is committing to the purchase of the item if he or she wins the auction. (Ex. 9, Depo. of Cheong at 30:12-19.)

10.  "Buy it Now" is another mechanism available to sellers on eBay. (Ex. 8, eBay 2010 Annual Report at 3; Ex. 9, Depo. of Cheong at 16:16-19; Clark Rebuttal at ¶ 74.)  A seller using an auction-type listing may offer, as an alternative, a "Buy it Now" price that a potential buyer can pay to win the item and end the auction. (Ex. 4, Clark Rebuttal at ¶ 74).  Alternatively, a seller may use "Buy it Now" as the sole mechanism for a buyer to purchase the item.  (*Id.*)  Using "Buy It Now" similarly commits the potential buyer to the purchase.  (*Id.*; Ex. 9, Depo. of Cheong at 31:7-11.)  When a buyer selects "Buy it Now" the buyer's browser is directed to a further webpage on the eBay.com website. (Ex. 4, Clark Rebuttal, Ex. 5 at 2-4.)

11.  Regardless of which type of format is used, a buyer must login to the eBay web site before being able to purchase an item. (Ex. 4, Clark Rebuttal at ¶ 75; Ex. 4, Clark Rebuttal, Ex. 5 at 3.)  The communication to eBay of a buyer's login information is secured in part by using 128 bit SSL.  (*Id.*)  SSL stands for secure sockets layer, and while referenced generally in the patent, VECS does not contend it invented SSL.  (*Id.*)

12.  Regardless of the selling format used, as soon as a buyer has the winning bid on an item (or commits to buy using "Buy it Now"), the relevant eBay listing page is updated to reflect the fact that the item no longer is available, without any input from either the seller selling the product or the banks processing the eventual payment.  (*Id.* at ¶ 76.)  Because an eBay purchase is defined as a commitment to pay, the listing update is independent of and occurs before actual

payment. (*Id.*)  For example, in an auction-type listing, the winning bid may not be known for hours after the bid is placed. (Ex. 4, Clark Rebuttal at ¶ 73).

13.   At some point, a winning buyer is able to pay for the item won.   (*Id.* at ¶ 77.) On eBay, the available methods of paying for an item are dependent upon the payment methods the seller of the item has chosen to accept.  (*Id.*)  Thus, one seller may decide that they may only accept checks.  (*Id.*)  Another may decide to only accept money orders.  (*Id.*)  Another may decide to accept credit card payments.  (*Id.*)  Another may decide to accept PayPal only.  (*Id.*) The timing of payment also varies in accordance with a seller's preferences; some require immediate payment, some allow several days for payment.  (*Id.*)  In any scenario on eBay, the commitment to pay is different from the act of payment.  (*Id.*)

14.



*The Accused PayPal System*

15.   PayPal, Inc. is a wholly-owned subsidiary of eBay Inc.  (Defendants' Second Amended Answer and Counterclaims, Dkt. No. 135-1, at ¶ 11.)  PayPal, Inc. does not control the

actions of eBay Inc., and eBay Inc. does not act as an agent for PayPal, Inc.  (Ex. 11, Depo. of
Woloshin at 59:7-13.)

16.  In allowing the '753 patent, the Patent Office Examiner stated his reasons for
allowance.  In pertinent part, he said that the claimed invention of the '753 patent was allowable
because "[t]he credit card processing step also eliminates prior art, such as paypal, digicash, and
cybercash because each of these systems requires accounts for the users where, even if a user
loaded his/her account with a credit card, the credit card processing decision would not be
received by the merchant [Web, DB] server."  (Ex. 12, March 18, 2009 Notice of Allowance
(VEC000644) at 2.)

17.  PayPal allows a PayPal account holder multiple ways to fund their account.  For
example, a PayPal account holder can fund an account with PayPal balance (which is akin to
having a pre-loaded account), their bank account, or one or more credit cards.  (Ex. 4 Clark
Rebuttal at ¶ 81.)  Thus, just saying "paying with PayPal" does not require the input or use of a
credit card necessary for purposes of this case.  (*Id.*)  VECS' contentions include the situation
where a buyer from eBay wants to pay for an item using the "guest checkout" credit card feature
on PayPal.com.  (*Id.* at ¶ 82.)  As the name implies, the "guest checkout" feature is one that is
available for payers who do not have a PayPal account.  (*Id.*)  Using this feature, a person paying
for a purchase enters certain information, such as name, address, credit card number, expiration
date, and security code.  (*Id.*)  In the late stages of the case, VECS also is attempting to broaden
its accusation to encompass the situation where a PayPal account holder sends their username
and password to PayPal.  (*See* 5/2/11 Reply ISO Motion to Compel, Dkt. No. 128 at 6-8.)  In that
instance, the user is taken to their PayPal "wallet" which, depending on the user, may contain

8

multiple ways to pay through PayPal (e.g., checking account, pre-loaded balance, credit card).
(Ex. 13, PayPal User Agreement.)

18.  Using Guest Checkout, however, once a guest user/payer enters information such as
name, address, credit card number, expiration date, and security code, and orders PayPal to
authorize the transaction, ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████ (*Id.*)

19. Eventually, ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████ (*Id.*)  eBay then reflects the fact that payment has been
approved, so that a seller or buyer logging into their respective eBay accounts will know that the
transaction has been approved for payment.  (*Id.*)

20.  Once approval for a guest user/payer's credit card is received by PayPal from the
third-party processor, ████████████████████████████████████████

████████████████████████████████████████████

9



*Security*

21.

*(Id.)*

*(Id.)*

22.    VECS never put either eBay or PayPal on notice of the '753 patent before

bringing this lawsuit. (Ex. 14, Transcript of 2/18/11 Hearing on Motion to Strike at 18:2-3.)

The Court has ruled that the earliest possible date for any knowledge on Defendants' part of the

'753 patent is the date VECS filed its Second Amended Complaint. (*Id.* at 25:7-11).  VECS has

no evidence of any specific intent, prior to this date, on eBay's or PayPal's part to induce

infringement of the '753 patent.

10

23.    VECS has never practiced the '753 patent. (Ex. 15, Depo. of Tiehong Wang[4] at

13:4-5, 76:2-77:22). It does not compete with either eBay or PayPal. It has never licensed, or

even tried to license, the '753 patent. (*Id. at 63:25-64:3.*)

### C.    The Verza Prior Art System

24. Among several prior art systems and references is an e-commerce payment system

developed and operated by Verza, Inc. by 1998. (Ex. 18, Depo. of Kraaijvanger at 25:20-26:2,

30:15-32:14, 93:11-95:16, Exs. 8-9.) As described by one of Verza's founders, Mr. Kraaijvanger

in his deposition and in his Verza, Inc. Business Plan ("Verza Plan"), Verza offered secure credit

card payment services to small and mid-sized internet merchants that had established webpages

offering products for sale or that offered products on auction websites. (Ex. 19, Verza Plan at 3,

5, 17, 20; Depo. of Kraaijvanger at 47:24-49:3, 62:21-63:25.) The merchants displayed their

webpage product listings via their own unsecure websites or hosted on other third party websites

with other merchants. (Ex. 19, Verza Plan at 20, 24.) After registering for Verza's services, the

merchant was then able to insert an HTML button on the displayed webpage. (Ex. 18, Depo. of

Kraaijvanger at 29:7-30:6, 48:23-50:8.) That HTML button would operate such that a buyer

would first find an item she wished to purchase, and would then click on that HTML button. She

would then be redirected to a Verza-owned payment page hosted on a separate Verza server.

(Ex. 19, Verza Plan at 5; Ex. 18, Depo. of Kraaijvanger at 29:7-30:6, 48:23-50:8.)

25.  The Verza payment page and its communication with buyers was secured via SSL.

(Ex. 19, Verza Plan at 5, 25; Ex. 18, Depo. of Kraaijvanger at 29:7-30:6, 48:23-50:8, 62:21-

63:25.) The Verza payment page then presented information about the item that the buyer had

purchased, and directed the buyer to input his/her credit card information as well as any other

---

[4] Unless otherwise noted, reference to the Deposition of Tiehong Wang is to the deposition taken
on March 4, 2011 rather than that taken on April 22, 2011.

salient information. (Ex. 19, Verza Plan at 5, 25.) After the Verza server received necessary

payment information it transmitted the purchaser's information to the established financial

network. (e.g., First Data). (*Id.*, Ex. 18, Depo. of Kraaijvanger at 55:17-25.) Once the Verza

server received approval for the transaction from the financial network, it sent a confirmation to

both the seller and buyer. (Ex. 19, Verza Plan at 4, 7, 25.) The system then redirected the buyer

back from the Verza payment page back to the merchant's web page. (Ex. 18, Depo. of

Kraaijvanger at 29:7-30:6.)

## III.  ARGUMENT

Summary judgment is appropriate where the record indicates that "there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby.*

*Inc.,* 477 U.S. 242, 247-48 (1986).  A court evaluating the propriety of summary judgment must

view the record in the light most favorable to the nonmoving party. *See Bryant v. Bell Atl. Md.,*

*Inc.*, 288 F.3d 124, 132 (4th Cir. 2002).  But, the "mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [non-movant]." *Anderson,* 477 U.S. at 252.

Here, Defendants move for summary judgment on the following issues. ***First,***

Defendants do not literally infringe the asserted claims of the '753 patent under the proper claim

construction. ***Second***, Defendants cannot infringe all of the asserted claims where VECS relies

on a third party merchant, and cannot infringe claims 67 and 83 where VECS relies on PayPal

controlling eBay, because of these scenarios raise issues of divided infringement. ***Third***, VECS'

inducement claim fails as a matter of law. ***Fourth***, the priority date of the '753 patent cannot be

earlier than the date on which the application for the '705 patent was filed. *Fifth*, the '753

patent, if read in the same way VECS reads it for its accusations against Defendants, is invalid

over the Verza prior art system. *Sixth*, VECS is not entitled to injunctive relief.

### A.   CLAIM CONSTRUCTION-BASED NON-INFRINGEMENT: Under Proper Claim Constructions, Defendants Do Not Infringe the Asserted Claims of the '753 Patent as a Matter of Law

The '753 patent describes and claims a very particular system, a system whose limitations

prevented any commercial implementation. The patent requires a special type of "Web, DB"

server to interface with the Internet and contain merchant listings. It requires automatic, real-

time redirection of a purchaser from the Web, DB server to a secure payment server as soon as a

buyer is ready to purchase. And, it requires the payment server to act as a mere intermediary

between the buyer, and the established financial circuitry that approves or declines a credit card

transaction. There is no dispute as to the operation of eBay's and PayPal's respective system.

When properly construed, the accused systems cannot infringe the asserted claims because they

are missing key requirements of the claims.

Importantly, claims must be read from the point of view of one of ordinary skill in the art

of the patent. *See Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed.

Cir. 2008). Here, Defendants offer the opinions of Dr. Paul Clark, who has more than twenty-

five years of experience with various aspects of secure computer networks. In contrast, VECS'

proffered technical expert, Dr. Menascé, has not even provided any opinions on claim

construction, and Defendants' use of supporting testimony regarding what one of ordinary skill

would have understood the claims to mean is therefore uncontroverted.

Defendants' claim-construction based non-infringement motion is geared toward three

particular terms: (1) Web, DB server (and the like); (2) purchase request (and the like); and (3)

credit card payment information. Of these, resolving (1) or (2) in Defendants' favor would be wholly case-dispositive; resolving (3) in Defendants' favor would be largely case-dispositive.

**1.   "WEB, DB SERVER":  eBay Has the Requisite Security to Protect Credit Card Information Transmitted from a Buyer, and Therefore Cannot Have the Web, DB Server Required By the Claims**

VECS' infringement allegations identify (unspecified) eBay servers as meeting claim limitations that recite a "Web, DB server" or server "supporting a plurality of merchants." (*See, e.g.*, Dkt. No. 49-2 at 51-55.) However, the '753 patent specification imparts several characteristic features on the disclosed and claimed Web, DB server, at least one of which is not met by eBay's servers. Specifically, when properly construed, a Web, DB server according to the patent, by definition (in the context of the '753 patent), must lack adequate security to protect credit card information transmitted from a buyer. This follows from the purportedly foundational premise of the alleged invention that a separate secure payment server is required to enable e-commerce when a server listing items for sale lacks the proper security to handle credit card payments. *See, e.g., Fujitsu Ltd. v. Netgear, Inc.*, 620 F.3d 1321, 1335 (Fed. Cir. 2010) (rejecting ordinary meaning which contradicted "object of the invention" in specification). Further, VECS' own proffered expert witness, Mr. Johnson, opined that one of "the benefits of the inventions described in [the '753 patent]" is that "it removes merchants' responsibility and costs associated with providing online purchasers with secure payment processing operation." (Ex. 22, Expert Report of Mr. Johnson ("Johnson Report") at 16.) In contrast, eBay's systems <u>do</u> have the requisite security to protect buyers' credit card information; in fact, eBay has at least one functioning (non-accused) system that allows merchants to accept credit card payments from buyers on eBay web pages. For this reason, none of the asserted independent claims (nor the dependent ones, because they implicitly require the same elements as the independent claims) can be infringed because eBay servers are not the claimed Web, DB servers.

14

### (a)   The Proper Construction of "Web, DB server" (and Similar Terms)

Each of the asserted independent claims recites a server that provides both web services as well as database services.  Claims 17 and 30 include, respectively, "a Web, DB server separate from the payment server" and "a Web, DB server distant from the payment server." '753 patent, col. 7:39-40; 8:60.  Similarly, claim 55 includes "a server supporting a plurality of merchants and a corresponding website." *Id.* at 11:29-30.  Finally, claims 67 and 83 each recite "a website supporting a plurality of merchants and listing respective items of the merchants…the server supporting the plurality of merchants." *Id.* at 12:50-52, 55-56; 14:39-41, 62-63.  For the sake of convenience, all of these claimed servers will be referred to generically here as "Web, DB" servers, and resolving the construction in Defendants' favor would be case-dispositive.

In the context of the patent, these terms should be construed to mean "a computer located close to the buyer that includes both a web server and a database containing merchant listings for conducting the online purchases which lacks an adequately secure encryption system for transmission of credit card information on the Internet."  The specification and the prosecution history support this construction.  Moreover, as a confirmatory measure, the scant documentation provided by the named inventors, while extrinsic, also confirm that this is the proper reading of this term.

***The Web, DB server is a computer located close to the buyer.***  The patent specification teaches that an object of the invention, "by locating the Web, DB server close to the buyers with a high-speed local network, is to resolve the problem of bandwidth bottleneck occurring in cross-border internet transmission[.]" *Id.* at 2:66-3:5.  During prosecution, the applicants also attempted to overcome a prior art rejection by relying on an affidavit by an attorney who prosecuted the application for the predecessor '705 patent.  In the affidavit, the applicants'

15

attorney stated that the "invention also provided a solution to eliminate or reduce the network 'bottle neck' problem for digital files transmission by locating the Web, DB Server in a local area close to the customers and setting up a high speed local network." The proximity of the Web, DB server to the buyer in an Internet transaction was essential to overcoming one of the problems sought to be solved by the applicants.

*The Web, DB server must have web and database (DB) functionality.* The dual **web** and **d**ata**b**ase functionality is born out not only by the term itself (in claims 17 and 30) – "**Web, DB**" – but also in the written description of the server. In relation to Figure 2 of the patent, the "inventive system for the conducting of an Internet transaction" is shown "wherein at least one merchant 30 maintains a website of products available for sale on the Web, DB (Database) server 32." '753 patent, col. 3:59-62. The specification further describes the system as allowing for a notification to the Web, DB server "whereby the merchant 30 whose product is sold is provided with notice of the purchase thereby enabling refreshment of product inventory and updating of its website on the Web, DB server 32." *Id.* at 4:27-30. Additionally, "in the inventive system, the server 32 is provided with a facility whereby each of the merchants may provide products available for purchase into a database on the server." *Id.* at 4:32-35. Plainly, the server supporting a plurality of merchants and for conducting online purchases, the Web, DB server 32, serves merchant websites and maintains a database of merchant listings.

*The Web, DB server must lack credit card security.* Finally, throughout the patent and couched in phrases such as "the invention," "the inventive system," and "the inventive method," the Web, DB server must lack adequate security to protect credit card information transmitted from a buyer. *See, e.g., Netcraft Corp. v. eBay Inc.*, 549 F.3d 1394, 1398 (Fed. Cir. 2008) (imparting description from specification regarding "the present invention" upon the claims).

16

The specification sets out that "[a]n object of the invention is to provide a method and system which overcomes the lack of adequately secure encryption and decryption in a merchant server to which a buyer wishes to provide credit card information for the purchase of products posted on such merchant server." '753 patent at Col. 2:38-42.

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1051 (Fed. Cir. 2010) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)). A review of the specification confirms that the Web, DB server is inadequately secure for credit card information. The rest of the intrinsic evidence provides further assurance of this characteristic.

In particular, the specification is clear that "[i]n this case, server 32 [the Web, DB server], in contradistinction to the merchant server 22 in [prior art] FIG. 1, does not have a credit card transaction security system sufficiently adequate to meet the security requirements of a buyer for making a purchase." '753 patent, col. 3:62-66. This statement explicitly instructs that the Web, DB server lacks adequate security to accept credit card information. In fact, the lack of adequate credit card security in this server is common to every disclosed embodiment of the alleged invention. Consequently, the '753 patent specification sums up the disclosure: "Through the above-described method a merchant maintaining a website of products for sale on a server which itself cannot provide an adequately secure encryption system for the transmission of credit card information to sell to a buyer who would otherwise not purchase products on the Internet." *Id.* at 5:41-45.

17

During prosecution, the applicants distinguished over the prior art systems by arguing that the prior art failed to consider "an important problem addressed in Applicants application, namely, that there are situations in which sufficient security software is unavailable or prohibitively expensive to a merchant." Thus, in explaining the benefits of providing a separate secure payment server, the applicants again characterize the Web, DB server as one which lacks sufficient security software.

In sum, the intrinsic evidence demonstrates that the Web, DB server of claims 17 and 30 and the server supporting a plurality of merchants of claims 55, 67, and 83 is "a computer located close to the buyer that includes both a web server and a database containing merchant listings for conducting the online purchases which lacks an adequately secure encryption system for transmission of credit card information on the Internet."

Notably, the characterization of the server is not an after-the-fact one: at every stage of development, long before the claims were drafted or this lawsuit filed, the named inventors considered the characteristics of the Web, DB server to be a central aspect of their alleged invention. During her deposition, named inventor (and VECS CEO) Tiehong Wang said ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ (Ex. 15, Depo. of

Tiehong Wang at 111:25-112:7.) This objective sets the context for the entirety of the invention, and confirms the conclusion drawn from the intrinsic evidence: the Web, DB server must be one

that is close to the buyer, imbued with both web and database functionality, and lack adequate security for credit card information.

> **(b)      eBay Servers Are Not Web, DB Servers, And Therefore Cannot Infringe**

Properly construed, the claimed Web, DB server must lack adequate security to protect credit card information. Indisputably, eBay servers have adequate security to protect credit card information transmitted from a buyer.[5]

First, eBay itself accepts credit card information. It does so, for example, through the use of eBay's Integrated Merchant Credit Card ("iMCC") service. The iMCC feature provides the capability for eBay sellers to accept credit card payments from buyers for sales on eBay using the seller's Internet Merchant Account. (Ex. 20, Integrated Merchant Credit Card.) Using iMCC, eBay merchants can accept credit card payments such that buyers enter their credit card number and other information into eBay's website, which is then sent to the merchant's payment processor and managed there. (Ex. 21, Special Seller Update: eBay Checkout, http://pages.ebay.com/sellerinformation/news/imcc2010.html, *last visited* Apr. 21, 2011.) Moreover, "eBay is PCI Security Standards Council compliant and follows all the online security standards required for transmitting sensitive payment data securely to your payment processor." (*Id.*) Plainly, eBay's servers have an adequate encryption system for transmission of credit card information on the Internet and cannot, as a matter of law, be a "Web, DB server" as required by asserted claims 17, 30, 55, 67, and 83.

---

[5] Plaintiff also has not provided any evidence that eBay servers are located close to any buyer (at least because it has never identified any specific accused buyer) or that any particular eBay server includes the required web and database functionality. For purposes of summary judgment, however, the security distinctions between the claimed server and eBay's provides ample grounds for finding non-infringement. Defendants reserve their rights to advance the other distinctions if and when necessary.

Second, to the extent VECS claims that the application of SSL encryption (or, in shorthand, the moniker "https") qualifies as sufficient security to protect credit card information, eBay too has the same type of security. Indeed, several eBay pages exhibit the use of the https moniker – see, for example, the login page on eBay. This principle is illustrated by VECS' own infringement contentions. For example, to suggest that the communication between a buyer's browser and eBay is less secure than the communication between the same buyer's browser and PayPal.com, VECS notes that the former transmission uses the Hypertext Transfer Protocol (http) while the latter transmission uses Hypertext Transfer Protocol Secure (https). (*See, e.g.*, Dkt. No. 49-2 at 41-42.) VECS' implication is that transmission over https is secure enough to safeguard a buyer's credit card information on the Internet. Dr. Clark, Defendants' expert, demonstrated that eBay uses High-Grade Encryption for its https webpages, including the eBay login page (which must be used to even bid or purchase an item, let alone pay for it). Thus, there are multiple, indisputable examples of eBay's systems functioning outside of the requirements of the recited Web, DB server. Because eBay's servers cannot qualify as the required Web, DB server, eBay cannot infringe any of the asserted claims of the '753 patent.

### 2. "PURCHASE REQUEST": A Buyer's Commitment To Buy On eBay Does Not Cause The Switch Required By The Claims.

The asserted independent claims (and therefore, the dependent ones too) of the '753 patent each recite a step of switching or shifting the online communication of a buyer from the Web, DB server to the payment server when the Web, DB server receives a purchase request or other indication from the buyer to buy an item listed by a merchant on a Web, DB server. *See* '753 patent, col. 7:54-56; 9:6-9; 11:38-43; 12:55-59; 83:45-48. In short, the patent requires that the buyer be switched from the Web, DB server to the payment server automatically, as soon as the buyer indicates a desire to buy. In contrast to this requirement, a buyer on eBay is not

20

switched anywhere upon a commitment to purchase an item. VECS' own contentions bear this out: an eBay buyer is shifted from eBay.com to PayPal.com only when a buyer indicates that they want to <u>pay</u> for item purchased on eBay or another third-party merchant website (an act that can come long after the commitment to buy). (*See, e.g.*, Dkt. No. 49-2 at 63, 13 ("Continue with PayPal" button).) Because there is no shift in communication when a buyer makes a purchase request, the asserted independent claims of the '753 patent cannot be infringed.[6]

(a)   **"purchase request" / "an indication from the buyer to buy"**

The claims asserted by VECS each recite a step in which a buyer decides to purchase an item listed for sale on a merchant website. For example, claim 17 recites a "purchase request [received] at the Web, DB server from a buyer for one or more of the items listed on the Web, DB server." '753 patent, col. 7:51-53. Claim 55, recites "the website of the server supporting a plurality of merchants receiv[ing] an indication from a buyer to buy one or more of the products." *Id.* at 11:38-43. For the sake of convenience, these acts will be referred to as a "purchase request."

These purchase requests should be construed, in accordance with the ordinary meaning of the term, to mean: "a commitment to buy." Purchasing an item involves signaling to a merchant that the item should not be made available to others—that it is no longer on the market available for purchase by other buyers. Further, purchasing also signals to the merchant that the buyer has committed to buy, or pay for, the item. The specification of the '753 patent bears this out. For example in Figure 4A, reproduced in Appendix D, describes the step of a purchase request. As illustrated, the purchase request is a unitary combination of product selection and willingness to pay: "Step 2: One of the buyers 20 browses websites of Web, DB server 32 for products

---

[6]   VECS defines these terms as "an indication from the buyer to pay for an item" or "an indication from the buyer to pay for one or more of the items."

available for sale, selects product(s) for purchase and indicates payment by credit card." *Id.* at 5:

4-7. Further, "[w]hen a product displayed on a particular merchant website on the server 32 is

determined by the buyer to be purchased and the buyer indicates a desire to submit credit card

information, the buyer is shifted to the payment server 33 for direct communication therewith for

entry of credit card information onto the secure transaction system." *Id.* at 4:7-13. Again, the

purchase request is a commitment to buy, i.e., a product is selected and willingness to purchase

indicated. The prosecution history confirms this reading. In the Examiner's statement of reasons

for allowing the '753 patent, the Examiner characterized the allowed (claimed) invention as

follows:

> [The independent claims] recite a specific method of e-commerce.
> The method includes receiving, at a merchant server, **an
> identification of a product that an online shopper would like to
> purchase. After receiving the identification of the product, the
> communication is switched from the merchant server to the
> payment server**. Credit card information is received in order to
> purchase the product and the credit card information is [sent] to an
> established financial channel and credit card payment processing
> decision is returned.

(Ex. 12, March 18, 2009 Notice of Allowance (VEC000644) at 2 (emphasis added).) Thus, the

Patent Office Examiner also recognized that patent requires that the commitment to buy a

selected product triggers the switch from the Web, DB server to the payment server.

### (b)   A Commitment to Buy On eBay Does Not Cause a Switch To PayPal.

VECS alleges that the Web, DB server is eBay, and the payment server is PayPal.

Assuming *arguendo* that to be the case, none of the asserted claims are infringed because a

commitment to buy on eBay does not trigger redirection of the buyer to PayPal. Instead, in

selected situations, a buyer is redirected to PayPal only after the buyer performs a step in

addition to committing to buy, namely deciding to pay immediately with PayPal. On eBay, the

commitment to buy is decoupled from the act of payment. For example, in an auction-type listing, a buyer commits to buy as soon as the buyer places a bid; the winning bid may not be known for hours or days afterward. Additionally, even once a buyer on eBay has won an item, there is no eBay requirement that the buyer pay immediately, using credit cards, PayPal, or otherwise. Only when a buyer decides to pay at some point in time (which, again, could be hours or days after committing to buy) is there a potential redirection from eBay to someplace else (such as PayPal).

Asserted claim 17 recites the step of "when the Web, DB server receives the purchase request, switching communication of the buyer from the Web, DB server to the payment server." '753 patent, col. 7:54-56. The system of asserted claim 30 includes "the communication with the buyer being switched from the Web, DB server to the payment server when the Web, DB server receives an indication from the buyer to buy one or more of the items." *Id.* at 9:6-10; *see also id.* at 12:55-59, 14:45-48 (reciting comparable language in claims 67 and 83). Similarly, the online method of asserted claim 55 recites that "when the website of the server supporting a plurality of merchants receives an indication from a buyer to buy one or more of the products, the online communication with the buyer shifts from the website of the server supporting a plurality of merchants to the website of the payment server." *Id.* at 11:38-43. Each of these claim limitations requires a shift in communications in response to the buyer's purchase request. As discussed above, there is no shift of the buyer upon a purchase request on eBay.

For at least this reason, the Court should grant Defendants' motion for summary judgment of non-infringement on all asserted claims.

3.   **"CREDIT CARD PAYMENT INFORMATION": Credit Card Payment Information Is Entered into PayPal by a Buyer Only When a Credit Card Funding Source Is First Configured**

PayPal users do not enter a credit card number and expiration date to make a real-time payment for Internet purchases as required by the asserted claims of the '753 patent.[7] PayPal accounts function essentially as a virtual wallet, and are funded by one or more financial instruments such as a bank account, credit card, or debit card. Each of these funding sources is configured during a setup process. Thereafter, when a buyer wants to pay with PayPal, on eBay or otherwise, that buyer enters login and password information to access the PayPal account and then actively selects one of the funding sources. But these examples fail to show the entry of credit card payment information such as the account number other than when that credit card funding source is first set up.

(a)   **"credit card payment information"**

All of the asserted independent claims contain the term "credit card payment information." For example, claim 17 recites "the payment server receiving credit card payment information from the buyer to pay for the item to be purchased; the payment server sending, to an established financial circuitry, the credit card payment information; the payment server receiving, from the established financial circuitry, a credit card payment processing decision." '753 patent, col. 7:58-65; see similar terms in each asserted claim at *id.* at 9:17-24; 11:44-51; 12:48-52, 60-63; 14:37-41, 48-51. Throughout the independent claims, the term "credit card payment information" should be construed to mean "the information needed for a bank to approve or reject a credit card transaction including at least the credit card number and expiration

---

[7] During a "guest checkout"—a feature that is available for payers who do not have a PayPal account—a person paying for a purchase enters certain information, such as name, address, credit card number, expiration date, and security code. However, even this "guest checkout" feature does not infringe any of the asserted claims for several reasons that are beyond the scope of this particular brief.

date."[8] The limitations that include the term are themselves instructive on its meaning, as is the specification.

Patent claim construction analysis should begin by considering the language of the claims themselves. *See Edward Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1327 (Fed. Cir. 2009). Claim 30, for example, recites a system whereby "the payment server sends, to an established financial circuitry, *the* credit card payment information; the payment server receives, from the established financial circuitry, a credit card payment processing decision." '753 patent, col. 9:20-24 (emphasis added). The use of antecedent basis in the claim confirms that "the" credit card payment information sent to the established financial circuitry is the same information received by the payment server when sent by a buyer. *See Masimo Corp. v. Mallinckrodt Inc.*, 18 Fed. Appx. 852, 856 (Fed. Cir. 2001) (holding that the later recited "adaptive canceler" must be construed to be the same as the earlier introduced "adaptive filter" because of antecedent basis). These limitations mandate the credit card payment information that is sent to an established financial circuitry be sufficient to result in a credit card payment processing decision. This reasoning supports Defendants' construction that "credit card payment information" must include information needed for a bank to approve or reject a credit card transaction.

The specification further supports this conclusion. For instance, Figure 3 "illustrates the inventive method by which the system of FIG. 2 is operated in conducting business in an e-Commerce network" and includes the following steps:

_____

[8]  VECS seems to agree in substance with Defendants' definition, because it defines the term to mean "identifying information related to a buyer's credit card account that enables a credit card transaction," but VECS adds the further clause "and/or verification information, such as user name and password, that specifies the identifying information." Even under VECS' additional construction, Defendants do not infringe because entry of a user name and password into PayPal only takes the buyer to their PayPal wallet, and does not automatically specify the identifying information needed to enable a credit card transaction. (Ex. 4, Clark Rebuttal at ¶ 82 n.1.)

Step 5
Payment server 33 transmits encrypted credit card payment information to acquiring bank 34.

Step 6
Acquiring bank 34 processes encrypted credit card payment information and transmits information to buyer's bank 36 which confirms or rejects credit card payment and responds to acquiring bank 34, and if confirms, internally debits buyer's account and credit's merchant's account.

'753 patent, col. 4:63-65, 5:16-25.  It is also the understanding of one of the named inventors, Ms. Wang, that credit card payment information is that information that would be necessary for a bank to approve or decline a credit card transaction:



(Ex. 15, Depo. of Tiehong Wang at 228:2-22 (objections omitted).)  The types of identifying information related to a buyer's credit card is generally known to include, for example, the buyer's name, credit card number, and credit card expiration date.

Consistent with the claim language, the specification, the inventor's understanding, and the understanding of one of ordinary skill in the art, the claim term "credit card payment information" should be construed as "the information needed for a bank to approve or reject a credit card transaction including at least the credit card number and expiration date."

**(b)    PayPal Accountholders Do Not Enter Credit Card Payment Information For Every Purchase**

26

PayPal users paying with a credit card-funded PayPal account will only enter a credit card number when they provision the account with that particular funding source. For example, Dr. Menascé, VECS' technical expert, demonstrates adding a credit card funding source to a PayPal account in Exhibit C to his opening report. (*See* Ex. 3, Menascé Inf. at 23, 73, 78, 100, 103, 125, 148, 150, 164, 190, 195, 201, 226, 228.) A funding source can be added by a user as part of account setup or maintenance, and not necessarily in connection with a purchase. Although a credit card funding source may be added during a payment, VECS has provided no evidence of when this happens or how often it is done by any buyer, or whether the activity happens in real time.

The asserted independent claims, however, require (using claim 17 as an example) that "the payment server receiv[e] credit card payment information from the buyer to pay for the item to be purchased." '753 patent, col. 7:57-59. Under Defendants' proposed construction, the claims require a buyer to enter at least credit card number and expiration date in order to pay for the item purchased. VECS' position that is that entry of a PayPal username and password is sufficient. However, it is not plausible that a third-party bank could utilize a PayPal username and password to approve or decline a credit card transaction. A bank has no data on a buyer's PayPal username or password, and has no way of linking this information to a buyer's credit card.

Because PayPal accountholders enter a username and password into a PayPal website when they decide to pay with PayPal, the asserted claims requiring such credit card information of the '753 patent cannot be infringed.[9]

---

[9]  Notably, VECS has never alleged that this claim element (or any other) is infringed under the doctrine of equivalents.

**B.     NON-INFRINGEMENT BASED ON DIVIDED INFRINGEMENT:**
**Defendants Cannot Infringe All of the Limitations of the Claims of the '753**
**Patent Because these Claims Require Actions by Multiple Parties**

The asserted claims of the '753 patent each require concerted action and interaction

between both the Web, DB server and the payment server. *See, e.g.*, Appendix E hereto.

Defendants move for summary judgment of non-infringement as to two specific scenarios under

the claims: (1) where VECS has attributed the Web, DB server to a third party which is under

neither Defendants' control; and (2) where VECS has alleged PayPal to be the direct infringer,

despite requiring eBay's presence to show infringement, because PayPal does not control eBay.

**1.     VECS Accusations Require eBay and PayPal and other third parties**

On January 21, 2011, VECS served its initial disclosure of asserted claims and

infringement contentions on Defendants.  Throughout those allegations, plaintiff identified some

unspecified eBay server as corresponding to the "Web, DB server" in the claims and some

unspecified PayPal server as the payment server.  (*See, e.g.*, Dkt. No. 49-2 at 17 ("When the

eBay server receives a purchase request, eBay switches communication of the buyer from the

eBay server, providing the buyer with the [eBay] web pages to its payment server, providing

[PayPal] web pages."); *see also id.* at 114.)  Not a single third party was expressly mentioned in

those contentions.[10]

Shortly thereafter, VECS served its second amended complaint [SAC], appending to it as

an exhibit the contentions.  Relying again on the activities of only eBay and PayPal and no other

third parties, the SAC alleged, *inter alia*, that PayPal was directly infringing independent claims

67 and 83, and that eBay was directly infringing independent claims 17, 30, and 55 of the '753

---

[10]  Each of the asserted claims requires actions by third parties, such as buyers, merchants, and
banks.  Defendants are not, however, moving for summary judgment on this species of divided
infringement at this time.

patent. (*See* SAC, Dkt. No. 49 at ¶¶ 23, 39.)  Despite each of the independent claims requiring

separate action by the Web, DB server and the payment server, VECS claimed that direct

infringement existed because "eBay directs and controls the actions of PayPal." (*Id.* at ¶ 17.)

On March 25, 2011, plaintiff submitted its Infringement Expert Report of Daniel

Menascé. (*See* Ex. 3 (without attachments), Menascé Inf.)  The Menascé Infringement Report

addresses the same independent claims identified in the SAC, but purports to make an

infringement read using a number of third-party (*i.e.*, "off-eBay") merchant websites to satisfy

the Web, DB server limitation. (*See id.* at 12 ("I have used the systems at www.aliexpress.com,

http://auctions.overstock.com, www.buy.com, www.eBid.com, www.iOffer.com, and

www.webstore.com.  Screenshots related to these systems appear in the charts [and] show

sequences of items being bought and paid for with PayPal.").)

### 2.    The Law of Joint (Divided) Infringement

Direct infringement requires that a single party perform each and every step of a method

or use each element of a product. *See BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373,

1378 (Fed. Cir. 2007) (citation omitted).  Where a method claim requires actions or steps by

multiple parties, there can be no direct infringement unless the accused infringer is a *single* party

that is controlling or directing the actions of the others.  In other words, a party cannot avoid

infringement by contracting out steps of that patented process to another entity. *See id.* at 1381.

If it does, that party may be liable under a theory of joint infringement.

"Under *BMC Resources*, the control or direction standard is satisfied in situations where

the law would traditionally hold the accused direct infringer vicariously liable for the acts

committed by another party that are required to complete performance of a claimed method."

*Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1330 (Fed. Cir. 2008) (no infringement

where claims were directed to methods for conducting online auctions and one claim step

required action by bidder and the rest required action by auctioneer). The Federal Circuit has made clear that the accused infringer must control any third parties relied upon to satisfy the claim. *See McKesson Techs. Inc. v. Epic Sys. Corp.*, -- F.3d --, 2011 WL 1365548, at *5 (Fed. Cir. Apr. 12, 2011); *TecSec, Inc. v. Int'l Bus. Machines Corp.*, -- F. Supp. 2d --, 2011 WL 779886, at *19 (E.D.Va. Mar. 3, 2011).

Importantly, the doctrine is not limited to process or method claims. Joint infringement also applies in the context of system and apparatus claims. *See Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1380-81 (Fed. Cir. 2010) (affirming district court entry of JMOL of noninfringement, which "was properly granted as to the system claims as well as to the process claims"); *see also Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1286-87 (Fed. Cir. 2011); *Cross Med. Prods. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310-11 (Fed. Cir. 2005); *Tech. Patents LLC v. Deutsche Telekom AG*, 2010 WL 3895338, at *7 (D. Md. Sept. 29, 2010); *Phoenix Sol'ns, Inc. v. DirecTV Group, Inc.*, 2009 U.S. Dist. LEXIS 114977, *29 (C.D. Cal. Nov. 23, 2009).

The trenchant question is whether the claim necessarily requires the actions of multiple parties and, if so, what the nature of their relationship is. Any concerns over a party avoiding infringement by arms-length cooperation can usually be offset by proper claim drafting, such as claiming steps that "might have featured references to a single party's supplying or receiving each element of the claimed process." *BMC Resources,* 498 F.3d at 1381. If that is not done, then it is not the province of this Court to "unilaterally restructure the claim or the standards for joint infringement to remedy these ill-conceived claims." *Id.*

VECS has asserted claims that plainly suffer from a joint infringement problem. That is, each of the asserted independent claims in this case requires the actions of at least two different

30

actors—(1) the party controlling the Web, DB server and (2) the party controlling the payment server.[11]  With respect to the third-party, off-eBay transactions, there is no evidence that those merchants have an agency relationship with PayPal.  As a result, there is no triable issue of material fact and those infringement allegations must fail.  Likewise, with respect to independent claims 67 and 83, the claims require actions by multiple parties and there is no evidence that PayPal directs or controls the actions of eBay or any third party.  Thus, summary judgment of noninfringement on these claims is appropriate.[12]

### 3. PayPal Does Not Control Aliexpress, Overstock.com, Buy.com, eBid, iOffer, and Webstore

According to VECS, PayPal directly infringes '753 patent claims 67 and 83, and it does so in concert with these third-party merchants, with the merchants playing the role of the Web, DB server.  For example, VECS alleges that the Aliexpress is Web, DB server which causes the switch to the PayPal payment server upon a buyer's decision to purchase using his credit card.

The requirement of action by Aliexpress[13] means that VECS is treating the claim as one which is jointly infringed. *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1330 (Fed. Cir. 2008) (no infringement where claims were directed to methods for conducting online

---

[11] Defendants contend that the asserted claims of the '753 patent in fact require the actions of at least two other parties—buyers and financial institutions.  For purposes of this motion, defendants focus on the Web, DB server and payment server, but reserve the right to make additional arguments regarding those additional actors at a later date.

[12] As mentioned above, VECS contends that eBay controls and/or directs the actions of PayPal.  Defendants disagree and reserve the right to challenge that assertion at the trial in this matter.  However, to streamline this case and limit to trial those issues about which there is a genuine dispute, this portion of the motion focuses only on the third party merchants and PayPal.

[13] VECS demanded and took discovery regarding Aliexpress, despite Aliexpress being a foreign entity.  To the extent VECS is alleging that third parties (e.g., merchants, buyers, banks) outside the United States are party to any act of infringement, its claims must necessarily fail for failing to satisfy the territorial requirements of 35 U.S.C. § 271(a). *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1315-16 (Fed. Cir. 2005); *see also Technology Patents, LLC v. Deutsche Telekom AG*, 573 F. Supp. 2d. 903, 919-22 (D. Md. 2008).

auctions and one claim step required action by bidder and the rest required action by auctioneer). But by Dr. Menascé's own analysis, there are numerous instances in which the actions of Aliexpress (and the other merchants) are absolutely necessary to meet the limitations of this claim. There is no evidence of record even hinting that PayPal controls or directs the activities of third party merchants Aliexpress, eBid, iOffer, Overstock.com, Buy.com, or Webstore. Nor did VECS attempt to develop such evidence. None of these third parties were subpoenaed or produced documents; no witnesses have testified in deposition about the relationship between PayPal and these entities; and no real effort has been made by plaintiff to prove this claim. Accordingly, summary judgment of noninfringement as to claims 67 and 83 is appropriate.

### 4. PayPal Does Not Control eBay

VECS also argues that PayPal directly infringes claims 67 and 83 in concert with eBay, but eBay is not accused of directly infringing the claim. Claims 67 and 83 require multiple actors, and PayPal itself does not perform all of the elements. At a minimum, in order for PayPal to directly infringe those claims, the actions of eBay must be considered and PayPal must control or direct the activities of eBay. This notion runs *directly counter* to plaintiff's allegations in the operative complaint. (*Compare* SAC, Dkt. No. 49 at ¶ 17 ("By virtue of eBay's ownership of Paypal, *eBay directs and controls the actions of PayPal* and PayPal consents to such direction and control.") (emphasis added).) Because claims 67 and 83 have not been asserted against eBay, plaintiff cannot point to any single direct infringer. *See id.* Accordingly, no reasonable jury could find PayPal has indirectly infringed claims 67 and 83, either. *See, e.g., McKesson Techs. Inc.*, 2011 WL 1365548, at *4 ("Absent direct infringement, [defendant] cannot be liable for indirect infringement.").

32

C.    **NO INDIRECT INFRINGEMENT:  VECS' Inducement Claim Fails as a Matter of Law**

In its Second Amended Complaint, VECS alleges that eBay induces infringement of claims 30, 35, and 36, and that PayPal induces infringement of claim 83. At the outset of the case, the Court limited the possible time period for inducement to after the service of the Second Amended Complaint because VECS conceded neither Defendant knew of the '753 patent before being sued. The Court further recognized that Defendants' inducement could only begin at the time that a valid complaint was served (because a previously dismissed complaint could not constitute adequate notice with regards to knowledge of the '753 patent). Now that discovery has closed, VECS' inducement claim still remains fatally deficient.

1.    **A Complaint cannot be the sole basis to establish knowledge of the patent.**

At the previous motion to dismiss hearing on February 18, 2011, this Court correctly noted that an invalid complaint cannot constitute adequate notice for purposes of proving inducement. The law requires one step further: *VECS legally could not have effectively sued eBay and PayPal based only on post-filing conduct.* Courts have recognized that a contrary result constitutes putting the proverbial cart before the horse, and decided that the filing of *any* Complaint, valid or not, simply cannot be the basis to show requisite knowledge of the patent for an inducement claim in the subject case of the complaint.

In *Knapp-Monarch Co. v. Casco Products Corp.*, the Seventh Circuit first held that inducement could not occur because the Plaintiff did not show the requisite knowledge requirements. 342 F. 2d 622, 626-27 (7th Cir. 1965). The Court then independently held that inducement could also not occur because "plaintiff is precluded from urging violations alleged to have occurred after [the] filing of this complaint as evidence of charges contained therein." *Id.* The Court held that a "cause of action is to be tested as of the time of the filing of the complaint

33

and if no act of infringement occurred prior to the filing of the complaint, it is *fatally defective and cannot be cured by infringement occurring subsequent to the filing of the complaint.*" *Id.* (citations omitted) (emphasis added).

More recently, the Court in *Xpoint Technologies, Inc. v. Microsoft Corp.* had this precise issue before it. *See* 730 F. Supp. 2d 349, 357 (D. Del. 2010). In *Xpoint Technologies*, the plaintiff argued that the filing of a Complaint could constitute notice for inducement purposes. But, the *Xpoint* court, like the *Knapp-Monarch* court before it, held that "knowledge after filing of the present action is not sufficient for pleading the requisite knowledge for indirect infringement." *Id*; *see also Insituform Techs., Inc. v. Cat Contracting, Inc.*, 161 F.3d 688, 695 (Fed. Cir. 1998) (holding that the defendant had no knowledge of patent before filing of complaint).

Since Defendants are being sued for indirect infringement occurring only after the service of the Second Amended Complaint, this Court should enter summary judgment in favor of Defendants.

### 2.    VECS has no evidence of specific intent.

Furthermore, there is no evidence that Defendants meet the scienter requirement for inducement. "In order to succeed on a claim of inducement of patent infringement under 35 U.S.C. § 271(b), "the patentee must show, first, that there has been direct infringement, and second, that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed. Cir. 2005). The elements of inducement must be proven by a preponderance of the evidence. *Warner-Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005).

Here, VECS cannot show by a preponderance of the evidence that eBay or PayPal possessed the "affirmative intent to cause direct infringement." *MEMC Elec. Materials, Inc.*, 420 F.3d at 1378. Indeed, the only related allegations in Plaintiff's Second Amended Complaint are that Defendants did not make any changes to their accused systems [again, post-filing] and did not "give [their] customers instructions on how to avoid infringement after the lawsuit was filed." (Dkt. No. 49 at 8-9, 11.) But none of these allegations, even if true and taken in combination with one another, could show the specific intent necessary to establish liability.

Inducement requires "[e]vidence of '*active steps* ... taken to encourage direct infringement,' such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use." *DSU Med. Corp. v. JSM Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc) (citation omitted) (emphasis added). Plaintiff has not alleged any "active steps" to encourage direct infringement. To the contrary, Plaintiff only points to lack of evidence, such as the lack of a design around, or lack of other changes to its system. But the lack of evidence is simply not relevant toward showing inducement. *Id.*; *Black & Decker (US) Inc. v. Catalina Lighting, Inc.*, 953 F. Supp. 134, 138 (E.D. Va. 1997) (inducement requires "the commission of an act that constitutes inducement, not merely the power to act or the failure to act"). Additionally, Plaintiff asserted that eBay and PayPal instruct their users on how to use the accused systems.[14] (SAC, Dkt. No. 49 at 9, 11.) An

---

[14]   VECS has not identified a single purported user who has been induced to infringe by either eBay or PayPal, rendering summary judgment of no indirect infringement proper on this ground as well. *See ACCO Brands, Inc. v. ABA Locks Mfr. Co., Ltd.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007) (to prove the direct-infringement element in cases where the plaintiff has pleaded indirect

instruction on how to operate a system does not show an *affirmative intent* by eBay or PayPal

that their system be used to infringe the '753 patent. *Metro-Goldwyn-Mayer Studios, Inc.*, 125 S.

Ct. at 2780 (holding that "ordinary acts incident to product distribution, such as offering

customers technical support or product updates" do not support liability under inducement); *Vita-*

*Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1328, 1329 (Fed. Cir. 2009). Moreover, there are

simply no facts in the record from any document production or deposition which could otherwise

support Plaintiff's claims for inducement. Indeed, when Defendants questioned Tiehong Wang,

Plaintiff's 30(b)(6) witness, Ms. Wang stated that she had no knowledge about eBay and

PayPal's purported attempt to induce users to infringe the '753 patent.[15]  For all of these reasons,

summary judgment in Defendants' favor on VECS' inducement claim is appropriate.

### D.      INVENTION DATE: The Invention Date of the '753 Patent Cannot Be Earlier Than the Date that the Application for the '705 Patent Was Filed

Defendants move for summary judgment that the priority date of the '753 patent is no

earlier than April 19, 2000 – the date on which the applicants filed the application for the

(predecessor) '705 patent with the Patent Office. Absent evidence to the contrary, the date on

which a patent application is filed is presumed to be the applicant's date of invention. *Bausch &*

*Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 449 (Fed. Cir. 1986). In order to

obtain an earlier priority date for the invention, an inventor must establish conception, diligence

---

liability, "a patentee must either point to specific instances of direct infringement or show that
the accused device necessarily infringes").

[15] VECS' counsel, on the other hand, represented on the record that VECS' infringement
positions could be found in VECS' interrogatory responses. (*Id.*)  But VECS' responses do not
substantively respond to inducement and instead refer to VECS' initial infringement contentions.
(Ex. 27, VECS' Resp. to Defs.' First Set of Interrogatories No. 2.)  The only reference to
inducement in Plaintiff's Initial Infringement Contentions is an assertion that "VECS contends
that PayPal indirectly infringes claim 83 of the '753 patent by inducing buyers to use the accused
apparatus, as shown in the attached charts."  The attached charts do not provide any explanation
whatsoever about the nature of any inducement. (*See* Ex. 28, 1/21/11 Inf. Contentions at Ex. 1.)

and reduction to practice by putting forth corroborating evidence to support a claim of priority. *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1999); *Hahn v. Wong*, 892 F.2d 1028, 1032-33 (Fed. Cir. 1989).

Here, the record lacks evidence that the inventors were diligent in reducing their invention to practice. *Kendall v. Searles*, 173 F.2d 986, 993 (CCPA 1949). According to the named inventors, they conceived of the invention around 1998. The record demonstrates that the three inventors were not diligent, though, in reducing their invention to practice from 1998 to the date on which they filed their application—April 19, 2000. The inventors cannot account for one to one-and-a-half years between the time at which they allegedly conceived of the invention and the time at which they filed the patent application. Further, VECS could offer no proof of their activities during this intervening time. This is hardly sufficient to establish the diligence that would entitle the applicants to a priority date any earlier than April 19, 2000.

Additionally, what little alleged diligence was undertaken also occurred outside of the United States. (*Id.* at 89:7-17; *see also* Ex. 29, Depo. of Tiejun Wang at 142:6-8 (testifying that discussions took place "[i]n China and in the United States because I'm not exactly sure all three are in China together all the time.").) According to 35 U.S.C. § 104, however, the patentees "may not establish date of invention by reference to knowledge or use thereof, or activity with respect to, in a foreign country other than a NAFTA country or a WTO[16] member country."[17] *See also Kondo v. Martel*, 220 U.S.P.Q. 47, 52 (Bd. Pat. Inter. 1983) ("However, acts done abroad may not be considered in establishing diligence in reducing the invention to practice.").

---

[16] China is not a member of NAFTA. It did not become a member of the WTO until December 11, 2001, more than a year after the inventors filed their patent application. (Ex. 30, Member Information: China and the WTO, World Trade Organization, http://www.wto.org/english/thewto_e/countries_e/china_e.htm, *last visited* May. 6, 2011.)

[17] This case does not fit into the exceptions listed in 35 U.S.C. § 104 because the applicants never filed a foreign application. (*See* Ex. 31, Depo. of Ximing Wang at 24:9-11.)

In addition, VECS has only produced one hand-written drawing with no date to purportedly show the operation of their invention while they were reducing it to practice. When asked about this document as VECS' 30(b)(6) designee, Ms. Wang answered that the drawing looked like her brother's drawing, but she was unable to remember when he made the drawings. (Ex. 15, Depo. of Tiehong Wang at 100:12-23.) There is no evidence that the inventors created a prototype or tested to determine whether their invention would work for its intended purpose. *cf. Estee Lauder Inc. v. L'Oreal, S.A.*, 129 F.3d 588, 593 (Fed. Cir. 1997). The inventors have not produced laboratory notebooks or any dated diagrams that would corroborate their claims that the invention was reduced to practice by April 1999. Thus, the patentees can show nothing earlier than the filing date as their priority date. Accordingly, the Court should grant summary judgment that the priority date for the '753 patent is no earlier than the filing date of the '705 patent—April 19, 2000.

### E.      INVALIDITY: The '753 Patent is Invalid As a Matter of Law

#### 1.      Verza is Invalidating Prior Art to the '753 Patent

While Defendants have uncovered several prior art systems which invalidate the asserted claims of the '753 patent, one in particular – the Verza system – stands unrebutted and is therefore ripe for summary judgment.

The Verza system was operational in 1998. It has been well-supported by the testimony of Paul Kraaijvanger, and corroborating documentation. VECS offered only two points of distinction between Verza and the '753 patent: (1) that the entire Verza System employed the same level of security throughout the purchase process; and (2) that the Verza web server and payment sever had the same internet addresses (i.e, were co-located). Both points were conclusively contradicted by Mr. Kraaijvanger's subsequent deposition.

The Verza System does, in fact, meet every element of the claimed invention and anticipates the '753 patent. As described by the Verza Plan and in Mr. Kraaijvanger's deposition, merchants who registered for Verza's services would either have their own unsecure websites or would exist on other third party websites hosted on separate servers from Verza's payment server. A buyer would click a button on the merchant's website to payment for an item and her communication would then be re-directed to a Verza-owned payment page on a Verza payment server, secured with SSL and with a different internet address. These facts flatly contradict VECS assertion that there is any distinction between the asserted claims and the VECS system. Here, Defendants show, through the unbiased and unimpeached testimony of a third party that the Verza system anticipates every element of each asserted claim of the '753 patent. As such, there is no genuine issue of material fact that the Verza system anticipates the '753 patent, and summary judgment should be granted in favor of Defendants for invalidity.

### F.   NO INJUNCTIVE RELIEF AVAILABLE: VECS Is Not Entitled to Injunctive Relief

An injunction is not meant to punish; a patent holder has "no cognizable interest in putting [an alleged infringer] out of business." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1311 n.12 (Fed. Cir. 2007). Indisputably, VECS has never practiced the patent, offers no products or services, and operates out of a corner of Ms. Wang's living room. Nor has VECS ever competed with either Defendant, or tried to license its patent. Accordingly, the Court should grant Defendants' motion for summary judgment that VECS is not entitled to injunctive relief. VECS cannot establish that it has suffered an irreparable injury for which legal remedies would be inadequate, by showing (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity

39

is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). To the contrary, monetary damages are sufficient to compensate VECS for any alleged infringement. District courts have previously found that legal remedies are inadequate to compensate a patentee who "risks continued loss of its goodwill," *Baden Sports, Inc. v. Kabushiki Kaisha Molten*, 2007 WL 2790777, at *2 n.1 (W.D. Wash. Sept. 25, 2007), or whose "reputation as a research institution has been impugned," *CSIRO*, 492 F. Supp. 2d at 605, or who suffers "loss of market share and the resulting lost profits and loss of brand name recognition." *Smith & Nephew*, 466 F. Supp. 2d at 983. None of these concerns are present here. And, the balance of hardships favors eBay and PayPal. VECS would not experience any gain, monetary or otherwise, if eBay and PayPal were enjoined from accepting credit cards in the manner accused as a form of payment for purchases made on eBay. Finally, the public interest would be disserved by a permanent injunction. By the end of 2010, eBay had approximately 94.5 million "active users," meaning individuals who have "bid on, bought, or listed an item during the preceding 12-month period." These users would have to adjust to using other methods of credit card payment. In contrast, VECS has is simply using the patent as a tool to obtain money. *See MercExchange v. eBay, Inc.*, 500 F. Supp. 2d 556, 572 (E.D. Va. 2007) (stating that the plaintiff "utilized its patents as a sword to extract money rather than as a shield to protect its right to exclude or its marketshare, reputation, goodwill, or name recognition"). Thus, the Court should grant summary judgment that VECS is not entitled to an injunction.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request entry of summary judgment in their favor on the issues briefed herein.

Dated:  May 6, 2011

Respectfully submitted,

**FISH & RICHARDSON P.C.**

By:   /s/ *Ahmed J. Davis*
      Ruffin B. Cordell (Va. Bar # 35449)
      rcordell@fr.com
      Ahmed J. Davis (Va. Bar # 43982)
      adavis@fr.com
      Indranil Mukerji (admitted *pro hac vice*)
      mukerji@fr.com
      **FISH & RICHARDSON P.C.**
      1425 K Street, N.W., Suite 1100
      Washington, D.C. 20005
      Telephone: (202) 783-5070
      Facsimile: (202) 783-2331

*Counsel for Defendants eBay Inc. and PayPal, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 6, 2011 by the Court's ECF system on all counsel so authorized to receive such documents, including the counsel identified below.

Terry L. Clark                                    Attorneys for
tclark@hdp.com
Harness Dickey & Pierce PLC          Plaintiff VECS
11730 Plaza America Dr.
Suite 600
Reston, VA 20190
(703) 668-8000

Matthew L. Cutler
mcutler@hdp.com
Harness Dickey & Pierce PLC
7700 Bonhomme Ave. Suite 400
Clayton, MO 63105

Anthony G. Simon
asimon@simonlawpc.com
701 Market St. Suite 1450
St. Louis, MO 63101

　　　　　　　　　　　　　　　　　　　　/s/ Ahmed Davis
　　　　　　　　　　　　　　　　　　　Ahmed Davis